RENDERED: FEBRUARY 24, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0146-WC

DEBORAH ROBBINS FRENCH                                                    APPELLANT


                          ON APPEAL FROM COURT OF APPEALS
V.                                   NO. 2020-CA-0547
                   WORKERS' COMPENSATION BOARD NO. WC-17-97124


REV-A-SHELF;                                                              APPELLEES
HONORABLE R. ROLAND CASE,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

On January 13, 2017, while employed by Rev-A-Shelf, Deborah Robbins French[1] sustained a work-related injury when she tripped over a pallet and injured her left wrist, arm, and shoulder. She initiated a claim for benefits pursuant to Kentucky Revised Statutes (KRS) Chapter 342, the Workers' Compensation chapter. After reviewing the evidence, an Administrative Law Judge (ALJ) awarded Robbins temporary total disability (TTD) benefits, permanent partial disability (PPD) benefits, and medical benefits. Specifically, and relevant to this appeal, the ALJ awarded her TTD benefits from April 26,

---

[1] Throughout these proceedings, Deborah Robbins French has been referred to as "Robbins." We do the same in this Opinion.

2017 through October 2, 2017 and applied the two-times multiplier from KRS 342.730(1)(c)2 to her PPD benefits. Rev-A-Shelf appealed the award to the Workers' Compensation Board (the Board), which vacated the award and remanded to the ALJ. Robbins then appealed to the Court of Appeals, which affirmed the Board. She now appeals to this Court as a matter of right. *See Vessels v. Brown-Forman Distillers Corp.*, 793 S.W.2d 795, 798 (Ky. 1990); KY. CONST. § 115.

## I.  BACKGROUND

Robbins was employed by Rev-A-Shelf as an assembly line leader. On January 13, 2017, while working for Rev-A-Shelf, Robbins tripped over a pallet and fell on her extended left arm. She reported pain in her wrist and shoulder. However, the wrist injury quickly resolved. Robbins continued working after her injury until April 25, 2017. She was eventually diagnosed with a Type II SLAP tear.[2] She underwent surgery in early June 2017. Robbins was paid TTD benefits from April 26, 2017 through August 29, 2017. Although the date she returned to work is one of the disputed issues underlying this appeal, it is uncontested that upon her return to work for Rev-A-Shelf, her pay rate was lower than it was prior to her injury.

---

[2] "A SLAP tear is an injury to the labrum of the shoulder, which is the ring of cartilage that surrounds the socket of the shoulder joint." Am. Acad. of Orthopaedic Surgeons, *SLAP Tears*, ORTHOINFO, https://orthoinfo.aaos.org/en/diseases--conditions/slap-tears/ (last modified Oct. 2019). A Type II tear "is the most common SLAP tear type. In Type II tears, the labrum and bicep tendon are torn from the shoulder socket." Cleveland Clinic, *SLAP Tear*, https://my.clevelandclinic.org/health/diseases/21717-slap-tear (last reviewed Aug. 20, 2021).

2

Robbins was released to return to light duty work with restrictions by her treating physician on August 29, 2017, and to regular duty work on October 2, 2017. She ceased her employment with Rev-A-Shelf on September 17, 2018. During the last few months of her employment with Rev-A Shelf, Robbins also worked as a home health aide for a private individual. She cooked for the gentleman, fed him, emptied his catheter, cleaned his room, and checked his blood pressure and blood sugar. She worked for him twenty hours per week on Saturdays and Sundays. In that capacity, Robbins earned $7.00 per hour for a total of $140 per week. She continued that employment after she ceased working for Rev-A-Shelf.

Robbins filed a claim against Rev-A-Shelf seeking workers' compensation benefits. As mentioned above, the ALJ awarded Robbins TTD benefits from April 26, 2017 through October 2, 2017. In the section of his order addressing TTD benefits, the ALJ did not make a specific factual finding regarding the date Robbins returned to work. Instead, he merely found that Robbins reached maximum medical improvement (MMI) on October 2, 2017. The next section of his order addressed permanent disability benefits under KRS 342.730. In it, the ALJ noted that Robbins "returned to work on October 2, 2017 and continued working full duty until September 17, 2018."

In his order on Rev-A-Shelf's Petition for Reconsideration, the ALJ noted that during her testimony at the final hearing, Robbins stated, "They sent me back I want to say somewhere in August or September. And since I couldn't perform the job duties, he put me back off work until November." The ALJ also

3

noted that the post-injury earnings record submitted by Rev-A-Shelf indicted no earnings in August, September, October, or November 2017. The ALJ therefore found that Robbins was entitled to TTD benefits through the date of MMI, which he had previously found to be October 2, 2017.

The ALJ awarded Robbins PPD benefits and applied the two-times multiplier from KRS 342.730(1)(c)2 to those benefits. However, because Robbins argued to the ALJ that she should be entitled to the three-times multiplier from KRS 342.730(1)(c)1, the ALJ first had to determine if Robbins "retain[ed] the physical capacity to return to the type of work that [she] performed at the time of injury." The ALJ found that "[a]lthough [Robbins] indicated she had difficulty performing her job and had to sometimes have help, the fact remains that [Robbins] was released to return to fully [sic] duty work without restrictions by her treating physician . . . and performed her job for approximately ten months." He also noted that Robbins worked as a home health aide earning $7.00 per hour working twenty hours per week during the last several months of her employment with Rev-A-Shelf. Based on these facts, the ALJ concluded that Robbins had the physical capacity to return to the type of work she was performing at the time of her injury.

Even though Robbins did not argue in favor of the two-times multiplier, the ALJ next analyzed whether she was entitled to it. The ALJ noted that even though Robbins was earning $1.00 less per hour when she returned to work at Rev-A-Shelf, when the income from her home health aide employment was "considered along with her regular employment," she returned to work at equal

4

or greater wages "at least during that period of time where she had concurrent employment." Finally, the ALJ concluded that Robbins was entitled to the two-times multiplier from September 17, 2018, when she ceased working at Rev-A-Shelf, until she returns to employment earning equal or greater wages.

Rev-A-Shelf appealed the ALJ's order to the Board arguing that the ALJ erred in awarding Robbins TTD benefits from August 30, 2017 through October 2, 2017 because, according to Rev-A-Shelf, Robbins returned to work on August 30. In support of this argument, Rev-A-Shelf pointed to inconsistent testimony from Robbins regarding the date she returned to work. Specifically, Rev-A-Shelf pointed to Robbins's deposition testimony in which she stated that she went back to work in August or September (as opposed to sometime after her MMI date of October 2 as found by the ALJ). In the same deposition, she also stated that she received TTD benefits for all periods of time when she was off work.[3] Both of Robbins's statements would support Rev-A-Shelf's contention that Robbins returned to work on August 30.

Rev-A-Shelf also argued that the ALJ erred in enhancing Robbins's PPD benefits with the two-times multiplier because he should not have included wages from her home health aide job in determining whether she had returned to work earning equal or greater wages. According to Rev-a-Shelf, Robbins did not prove that Rev-A-Shelf knew about her concurrent employment, or that the income she earned as a home health aide was covered under the Workers'

---

[3] Robbins was paid TTD benefits from April 26, 2017 through August 29, 2017.

Compensation Act (the Act).[4] Rev-A-Shelf argues that both knowledge and coverage under the Act are required for income from concurrent employment to be included in a post-injury wage calculation.

The Board agreed with Rev-A-Shelf and vacated and remanded those two portions of the ALJ's award. Specifically, the Board found that the ALJ's award of TTD benefits was "predicated upon an insufficient analysis." The Board stated,

> Before the ALJ can award the additional period of TTD benefits, he must first determine when Robbins returned to work. Although the ALJ cited to Robbins' hearing testimony, he did not reference her previous testimony, or for that matter, the discrepancy in her testimony at the hearing. The ALJ also referenced post-injury wage records submitted by Rev-A-Shelf. While those records indicate Robbins' earnings starting near the end of December 2017, they alone do not establish that she had no earnings prior to that date. On remand, the ALJ must provide additional findings supporting his determinations. If the ALJ in fact determines from the evidence Robbins did not return to work at the end of August 2017, he must provide a basis for his determination based upon the entirety of the evidence. If he determines Robbins indeed returned to work, the ALJ must perform the analysis as set forth above. This Board may not and does not direct any particular result because we are not permitted to engage in factfinding.

Regarding the two-times multiplier enhancement of Robbins's PPD benefits, the Board found that there was insufficient evidence that Robbins performed her home health aide work as anything other than an independent contractor. Independent contractor work does not fall within the scope of the Act. Thus,

---

[4] Income earned as an independent contractor is not covered under the Act. *Holman Enter. Tobacco Warehouse v. Carter*, 536 S.W.2d 461, 462 (Ky. 1976).

6

according to the Board, the income from that employment should not have been included in the ALJ's calculation of post-injury weekly wage.

Robbins then appealed the Board's decision to the Court of Appeals. The Court of Appeals affirmed the Board. Robbins then appealed to this Court. Both parties make the same arguments to this Court that they have made to both the Board and the Court of Appeals.

## II.     STANDARD OF REVIEW

Review by this Court of workers' compensation cases is limited "to address[ing] new or novel questions of statutory construction, or to reconsider[ing] precedent when such appears necessary, or to review[ing] a question of constitutional magnitude." *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 688 (Ky. 1992). In a workers' compensation case, the claimant has the burden of proving every element of her claim. *Gibbs v. Premier Scale Co./Ind. Scale Co.*, 50 S.W.3d 754, 763 (Ky. 2001). The ALJ has the sole discretion to determine the quality, character, and substance of the evidence and may reject any testimony and believe or disbelieve various parts of the evidence regardless of whether it comes from the same witness or the same party's total proof. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985); *Caudill v. Maloney's Disc. Stores*, 560 S.W.2d 15, 16 (Ky. 1977).

"Where the party with the burden of proof was successful before the ALJ, the issue on appeal is whether substantial evidence supported the ALJ's conclusion." *Whittaker v. Rowland*, 998 S.W.2d 479, 481 (Ky. 1999) (citation omitted). We therefore only reverse where the ALJ's decision is not supported

7

by "substantial evidence of probative value." *Wilkerson v. Kimball Int'l, Inc.*, 585 S.W.3d 231, 236 (Ky. 2019).

"Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971) (citation omitted). Finally, "[w]hen reviewing an ALJ's decision, this Court will reverse only if the ALJ overlooked or misconstrued controlling law or so flagrantly erred in evaluating the evidence that it has caused gross injustice." *U.S. Bank Home Mortg. v. Schrecker,* 455 S.W.3d 382, 384 (Ky. 2014) (citing *Kelly,* 827 S.W.2d at 687–88).

### III.    ANALYSIS

There are two issues before us: (1) did the ALJ err in awarding Robbins TTD benefits for August 30, 2017 to October 2, 2017; and (2) did the ALJ err in enhancing Robbins's PPD benefits by the two-times multiplier. We address each issue in turn.

#### A. TTD Benefits

In this case, no one disputes that Robbins reached MMI on October 2, 2017, which is the date the ALJ ended her TTD benefits. The question is whether she had "reached a level of improvement that would permit a return to employment" prior to that date.

KRS 342.0011(11)(a) defines temporary total disability as "the condition of an employee who has not reached maximum medical improvement from an injury and has not reached a level of improvement that would permit a return

8

to employment." In determining whether a claimant has "reached the level of improvement that would permit a return to employment," this Court has made clear that "[i]t would not be reasonable to terminate the benefits of an employee when he is released to perform minimal work but not the type [of work] that is customary or that he was performing at the time of his injury." *Cent. Ky. Steel v. Wise*, 19 S.W.3d 657, 659 (Ky. 2000). However, "it is also not reasonable, and it does not further the purpose for paying income benefits, to pay TTD benefits to an injured employee who has returned to employment simply because the work differs from what she performed at the time of injury." *Trane Commercial Sys. v. Tipton*, 481 S.W.3d 800, 807 (Ky. 2016). Additionally, "absent extraordinary circumstances, an award of TTD benefits is inappropriate if an injured employee has been released to return to customary employment, *i.e.* work within her physical restrictions and for which she has the experience, training, and education; *and* the employee has actually returned to employment." *Id.*

Under KRS 342.0011(11)(a), TTD benefits must cease whenever the first of two things occurs: either the claimant reaches MMI *or* the claimant reaches a level of improvement that would permit a return to her customary employment. In this case, the ALJ, perhaps implicitly, found that Robbins reached MMI either at the same time or prior to the time she reached the level of improvement that would permit a return to her customary employment. Because the date of MMI was the determinative factor for the ALJ, the ALJ was not required to find the exact date upon which Robbins reached the level of

9

improvement that would permit a return to her customary employment as long as he found it occurred sometime on or after her MMI date.

Admittedly, there was evidence in the record to indicate that Robbins reached the level of improvement that would permit a return to her customary employment and that she actually did return to said employment prior to her MMI date. However, that is not the standard by which we review the ALJ's decision. Instead of determining whether there was evidence that would have supported a different result, we must determine whether the decision the ALJ *did* make was supported by substantial evidence. In this case, it was.

The ALJ supported his finding by Robbins's testimony and the wage records submitted by Rev-A-Shelf. Specifically, the ALJ relied upon Robbins's testimony when she was asked, "How long were you off work after surgery?" She answered, "They sent me back I want to say somewhere in August or September. And since I couldn't perform the job duties, he put me back off work until November." The ALJ also relied upon the post-injury wage records submitted by Rev-A-Shelf. Those records, which Rev-A-Shelf submitted as evidence of Robbins's post-injury average weekly wage, did not show any earnings during the months of August, September, October, or November of 2017. The first post-injury earnings provided by Rev-A-Shelf were from the end of December 2017. Finally, we note that although the ALJ did not rely upon it, in Rev-A-Shelf's Notice of Disclosures filed at the beginning of the claim process, Rev-A-Shelf states that Robbins returned to work on December 28, 2017.

10

The foregoing constitutes substantial evidence. The ALJ's factual findings were sufficient to support his ultimate finding that Robbins reached MMI prior to the date she reached the level of improvement that would permit a return to her customary employment. Thus, we find no error in the ALJ's award of TTD through October 2, 2017, the date upon which Robbins reached MMI.

## B. PPD Benefits

We next turn to the issue of whether the ALJ erred in enhancing Robbins's PPD benefits by the two-times multiplier. Rev-A-Shelf argues that the ALJ erred in calculating Robbins's post-injury weekly wage in order to qualify her for the two-times multiplier.

KRS 342.730(1)(c)2 states,

> If an employee returns to work at a weekly wage equal to or greater than the average weekly wage at the time of injury, the weekly benefit for permanent partial disability shall be determined under paragraph (b) of this subsection for each week during which that employment is sustained. During any period of cessation of that employment, temporary or permanent, for any reason, with or without cause, payment of weekly benefits for permanent partial disability during the period of cessation shall be two (2) times the amount otherwise payable under paragraph (b) of this subsection. This provision shall not be construed so as to extend the duration of payments.

This subsection "applies without regard to whether the worker returns to the employment in which the injury occurred or to other employment." *Toy v. Coca Cola Enters.*, 274 S.W.3d 433, 435 (Ky. 2008).

The parties do not dispute that upon Robbins's return to work after her injury, she earned $1.00 per hour less than she had earned prior to her injury. Thus, if only her earnings from Rev-A-Shelf are considered, her weekly wage

11

post-injury was not "equal to or greater than the average weekly wage at the time of injury" to qualify her for the two-times multiplier in KRS 342.730(1)(c)2.

However, several months after returning to work (but a few months before she ceased employment with Rev-A-Shelf), Robbins began working as a home health aide in addition to working for Rev-A-Shelf. In her home health aide position, she earned $140 each week. When her earnings as a home health aide were added to the wages she was earning from Rev-A-Shelf, Robbins was earning more than her average weekly wage at the time of her injury. We therefore must determine whether the ALJ erred in including Robbins's earnings as a home health aide in her post-injury weekly wage for purposes of the two-times multiplier.

Rev-A-Shelf argues that the ALJ erred by including Robbins's home health aide earnings in calculating her post-injury weekly wage for two reasons: (1) because Robbins did not prove that Rev-A-Shelf had knowledge of her employment as a home health aide as required by KRS 342.140(5); and (2) because Robbins did not prove the income she earned as a home health aide was subject to the Act as required by *Hale v. Bell Aluminum*, 986 S.W.2d 152 (Ky. 1998).[5]

---

[5] "[A] worker's wages from a concurrent employment relationship are not to be included in the computation of the worker's average weekly wage pursuant to KRS 342.140(5) when such employment has been specifically excluded from coverage under the Act." *Id.* at 154 (citing *Wright v. Fardo*, 587 S.W.2d 269 (Ky. App. 1979); *Carter*, 536 S.W.2d 461).

Underlying Rev-A-Shelf's first argument on this issue is the presumption, based on its interpretation of *Ball v. Big Elk Creek Coal Co., Inc.*, 25 S.W.3d 115 (Ky. 2000), that KRS 342.150(5) applies to the calculation of Robbins's post-injury wages. Because this presumption is incorrect, Rev-A-Shelf's argument fails.

In *Ball*, the claimant returned to work with a different employer following his injury. *Id.* at 116. In this post-injury employment, the claimant's overtime and periodic bonuses fluctuated such that his weekly wage was only sometimes equal to or greater than his pre-injury average weekly wage. *Id.* The claimant argued that his weekly wage should be reviewed every week to determine if his wage that week was equal to or greater than his pre-injury average weekly wage. *Id.* This Court rejected that argument. *Id.* at 117. Instead, we held,

> The method which the legislature has chosen to determine a worker's income from a particular employment is the average weekly wage, the computation of which is set forth in KRS 342.140. Rather than focusing upon a particular week which may or may not accurately reflect the worker's earning capacity in the employment, KRS 342.140 requires the computation of an average of the worker's earnings over a period of 13 consecutive calendar weeks.

*Id.* at 117–18.

*Ball*'s holding was limited to the method of computing a claimant's wages. It held, in essence, that the claimant's post-injury wage must be an *average* weekly wage. *Ball* clearly applies to parts of KRS 342.140. However, we decline to extend its holding to KRS 342.140(5). If we were to interpret *Ball* as

extending to KRS 342.140(5), we would run afoul of the plain language of the statute itself, as described below.

KRS 342.140 explains how an employee's average weekly wage at the time of injury is to be calculated. Under that statute, "[w]hen the employee is working under concurrent contracts with two (2) or more employers and the defendant employer *has knowledge of the employment prior to the injury*, his or her wages from all the employers shall be considered as if earned from the employer liable for compensation." KRS 342.140(5) (emphasis added). By its plain language, KRS 342.140(5) only applies to pre-injury wages. It would be nonsensical to interpret it in any other way. It would be impossible for an employer to have "knowledge of the employment prior to the injury" in a situation such as the one before us today, where the concurrent employment did not arise until after the injury. The subsection, as written, provides no guidance as to how it would apply post-injury. We cannot, by judicial fiat, not only apply it post-injury but also determine the parameters by which to do so.

Having determined KRS 342.140(5) does not apply to the calculation of post-injury wages, we now turn to Rev-A-Shelf's argument that Robbins did not prove the income from her home health aide job came under the Act as opposed to being wages earned as an independent contractor. The ALJ made no findings regarding whether Robbins's earnings from that employment were covered by the Act. Because of this, we are unable to determine whether it was supported by substantial evidence in the record. *See City of Ashland v. Stumbo*, 461 S.W.3d 392 (Ky. 2015). As such, we vacate the ALJ's enhancement of

14

Robbins's PPD benefits by the two-times multiplier and remand for further factual findings on this issue.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the portion of the Court of Appeals' opinion vacating the ALJ's award of TTD benefits and affirm the portion of the Court of Appeals' opinion vacating the award of PPD benefits in so far as it applies to the enhancement. We remand to the ALJ for further factual findings regarding the two-times multiplier.

All sitting. All concur.


COUNSEL FOR APPELLANT, DEBORAH ROBBINS FRENCH:

Wayne Charles Daub

COUNSEL FOR APPELLEE, REV-A-SHELF:

Lyn Douglas Powers
Fulton, Devlin & Powers, LLC

APPELLEE, ADMINISTRATIVE LAW JUDGE:

Honorable R. Roland Case

APPELLEE, WORKERS' COMPENSATION BOARD:

Michael Wayne Alvey
Chairman